Case number 18-1203-L. Cleaning with strong complications from the Environmental Protection Agency, et al. Before we begin, let me just say a couple things about the structure of our marathon oral argument today. Number one, when you approach the microphone, please tell us who you are, who your client is, and give us a crisp sentence about what your issue is. Number two, the time allotments are firm. If you have five minutes, you have five minutes. If we go over, it will only be because one of us is asking questions, and it's your responsibility to preserve your rebuttal time. And third, as you think about how to keep your arguments within five minutes, remember that the court will be read the briefs, more familiar with the record, so focus on the issues. Next. Good morning, and may it please the court. Daniel Rottenberg on behalf of the state of Illinois. I will address the Monroe County designation, and I would like to reserve two minutes for rebuttal, please. The Clean Air Act requires that EPA conduct a designations process that is transparent, science-based, and driven by air quality factors. This court should vacate all of the challenge attainment designations at issue in this case because they are the result of a rulemaking that prioritizes outcome over process and science. It is telling that EPA has declined to defend nine of the 16 areas challenged, including eight of the 10 areas challenged by Illinois and Chicago. With respect to the Monroe County designation, that final designation was a result of outside-the-record communications initiated by EPA four days before the court-ordered designation deadline for the purpose of reversing years of technical work at the state and federal levels. The three-sentence letter that EPA solicited to support its predetermined outcome does not cite a single air quality consideration. This constitutes quintessential arbitrary decision-making. As this court has held, the process by which EPA reaches a result... designations stand on the basis of EPA's... of the record here, which is, as EPA pointed out, that the number of violated monitors dropped from five down to one. Your Honor, that argument that EPA now sets forth is a red herring. Even if the process that led to EPA's reversal were not so clearly painted, EPA still failed to explain why the facts and factors it relied on for its initial assessment were no longer relevant. Technical experts in Illinois and at EPA concluded throughout the entire process that Monroe contributes to a violating monitor, and the record supports this conclusion. Trajectories in the final technical support document still show transport from Monroe to the remaining violating monitor. Indeed, in the initial technical support document, EPA concluded that transport to the violating monitor comes predominantly from the south, and where Monroe is directly to the south of the remaining violating monitor. So EPA concluded that Monroe contributes to a violating monitor, and it is still contributing to that violating monitor. All of the other metrics analyzed by Illinois and EPA remain the same. Because the Monroe designation is both procedurally and substantively flawed, this court should vacate it. Thank you. Thank you. Well done. Under your... That's a great model. For everyone. He set a high standard. Good morning, and may it please the court. Sue Chen for the United States. And with me today are Suki Hoshijima from the Justice Department and Seth Luxbaum from EPA. And I'm here to respond to Monroe. I'd like to start by talking about petitioner standing and then move on to the merits. This court has no jurisdiction over the Monroe designation because petitioners have not shown standing. Illinois and Chicago claim direct injury in the form of vegetation damage to state and city parks in northeast Illinois, according to Dr. Zemba's supplemental declaration at paragraphs 7 and 8, but that has nothing to do with Monroe, which is in southwest Illinois. Dr. Zemba relies on a partial trajectory map of Illinois. This is now at paragraph 22 of his first declaration.  So they've provided no specific evidence of causation or redressability. Ms. Chen, we also have a declaration from, I think it's a Cook County or St. Charles County resident, a Sierra Club member, Pamela Yankee. And so somebody who is in the Chicago area clearly has standing based on at least the claim that Monroe. Well, those standing declarations... Actually, I'm sorry, St. Louis. I'm getting confused. It's a St. Louis area resident that I'm talking about. But those petitioners are not challenging the Monroe designation. They're challenging the Jefferson designation. I don't think it's limited. I think their petition was not so limited. No. In our brief, we set forth a chart of which petitioner is challenging what designation. I'm just saying that I don't see the record supporting that narrowness. And if it doesn't, then such a person would support standing, no? If the environmental groups are also challenging the Monroe designation, but they have not disputed what's in our brief, which is that they're not, we can ask them. Okay. Nor does the Clean Air Act give Illinois parents statutory authority at all by simply defining person to include state. Turning to the merits, I want to be clear on the Messina letter that EPA didn't rely on it in the holistic analysis, and we don't rely on the letter to defend EPA's analysis. It didn't rely on the Messina letter at all? That's not the way I read the record. Well, EPA noted the fact that Illinois revised its recommendation, but that's the same as how it notes the fact of every other state's recommendation. So we don't rely on it for the holistic analysis. I can understand why you would want to avoid the Messina letter, but it's a bit of a stretch, isn't it, to say you didn't rely on it at all? Not for the holistic analysis, no. What did you rely on it for? Well, it could go to notice, but as we discussed, the Messina letter makes notice inapplicable here, but even if notice were required, Illinois hasn't shown how it has been prejudiced by any procedural defect here, and really, how can it when Illinois is the one who wrote the letter that they're now complaining about? Well, you're not treating it as a change in the recommendation from the state. It is Illinois's revised recommendation of Monroe. I don't read the record that way because, in fact, I believe that the EPA's final TSC lists Monroe as a county that was recommended nonattainment by the state, and I thought it was more just maybe a waiver of the state's possible objection to that change, but not as an actual formal recommendation in contrast to Missouri's letter. How do they talk about it, characterize it as a recommendation? There was a footnote to the original recommendation that noted that Illinois had revised its recommendation, and in any case, even if notice were required, Illinois has not shown that there were prejudices by any procedural defect. Well, if we think the letter did play a role, what about the petitioner's argument that there's an inconsistency between what the Messina letter offered as a basis for nonattainment, namely the 2014 data, which didn't change at all, and EPA's rationale? In other words, their argument is that the agency will at least in part rely on a letter whose rationale for nonattainment is different than the one articulated by the agency. Don't we have to send that back? No, because EPA owes no deference to the state's recommendation. No, it's not a question of deference. It's a question of whether EPA's – if EPA, in fact, relied at least in part on the Messina letter and the Messina letter's rationale was different from EPA's, and you don't say anything about that in your brief, doesn't that have to go back for an explanation at least? No, because EPA provided an explanation of its actual rationale, which is that the updated data shows that the St. Louis region's ozone problem is much smaller than – Okay, thank you. Okay, thanks. Mr. Rotenberg, you successfully preserved your rebuttal time for a little more, I think. The explanation is not adequately explained. We don't need to reach the question of EPA's compliance or not with the 120-day notification requirement? No, Your Honor.  No, Your Honor. If the court concludes that the support for the final destination is inadequate, you don't need to reach it, although the 120-day letter is relevant to Counselor EPA's argument, because EPA is now arguing that the Messina letter somehow constituted a revised recommendation, but nowhere does the letter say that it is revising EPA's recommendation, nor could it as it does not contain any air quality analysis. With respect to our standing, paragraph 22 of Dr. Zemba's original declaration and paragraph 7 of the rebuttal declaration discuss transport from Monroe into the Chicago area, which, of course, is in the state of Illinois. The record and evidence before this court establish that ozone pollution harms Illinois' proprietary, sovereign, and quasi-sovereign interests. And what's the harm there? What's the relevant harm from Monroe's allegedly incorrect designation? Well, there are multiple harms, both direct and to the well-being of our residents. The harm from, because if Monroe is designated non-payment, sources in that area will not be required to reduce emissions as they would be were it properly designated. What I take EPA to be saying is, so Monroe, even though it's in Illinois, is near St. Louis, and the violating monitor that's at issue there is in the St. Louis area, right? And so what I take EPA to be saying is that to be in a position to have cause and redressability to support standing, that what one has to have is somebody who would say, if this violation weren't occurring, I would no longer be harmed. And so it has to be someone in the St. Louis area who is saying, I'm harmed, and if Monroe were held to the law, my harm would be released. And I don't understand why Zimba's declaration is relevant to that. Your Honor. If they're right about that requisite. I don't believe it is. I read that to be EPA's argument with respect to the NGO's standing, that they can't use declarations from members in contributing areas. And one of my co-counsel will address that argument. However, with respect to Illinois, if sources in Monroe County were required to reduce pollution, that would benefit the state in many ways as we've laid out. Thank you. Thank you. Yeah, thank you. Okay, we'll go on to Jefferson. May it please the Court. Maxine LaPellis representing Sierra Club in challenging EPA's decision to exclude Jefferson County from the St. Louis ozone non-attainment area. I've asked to reserve one minute for rebuttal. The exclusion of Jefferson was arbitrary and capricious because EPA lacked a rational explanation for its decision. The need for a rational explanation was particularly compelling because the decision marked a dramatic change, both from historic practice, as Jefferson has been in the non-attainment area since the 1979 ozone standard, and in this designation as it represented a 180-degree reversal from EPA's intended non-attainment designation. Does the reversal itself have to be justified? The decision has to be justified. And I'm saying the need for an explanation is reinforced by the fact that it's a dramatic reversal. And just to circle back on Monroe County, Pamela Yankee, who's a Sierra Club member, has a declaration that she's in that St. Louis area. Is Sierra Club not challenging Monroe County? As I read your petition, it was open-ended, but perhaps there's something we don't know. In fairness, I think we focused on Jefferson County. Sierra Club's focus for purposes of the St. Louis regional designation has been on the exclusion of Jefferson County. The state of Illinois and other parties were challenging Monroe. St. Louis is a bi-state region. The Mississippi River bisects the area. It's treated as one area, but Sierra Club's claim with respect to EPA's decision for the St. Louis area is focused on the exclusion of Jefferson County. And when you say its claim, I mean, when I look at the petition, the petition was not so focused. Right. But I'm trying to respond, you know, in my own mind to the EPA's standing contention. And so I'm trying to understand why, if there's a harmed individual there that's – who has a declaration submitted by one of the petitioners, is there any reason why we could not rely on that? We'd be happy to have you rely on it. We've only briefed Jefferson. The briefing, I understand, has been divided up. Yeah. We're happy to have you rely on those declarations for the other petitioners as well. The only explanation that EPA offered for excluding Jefferson relied on the state of Missouri's focus on just three of the 17 days when the West Alton Monitor was in violation. That explanation is not rational because it's contrary to EPA's own stated criteria, which is that you have to consider all 17 days. It ignores crucial facts in the record, which demonstrate throughout this designation process that Jefferson contributes to the West Alton Monitor. And it's materially different from EPA's treatment of Franklin County, another county in the same St. Louis metropolitan area, where EPA looked at all 17 violating days and rejected the state's revised recommendation to exclude Franklin going beyond the state's focus just on three days. So in terms of EPA's criteria, EPA states in its final decision document, we know that Missouri is focused just on the three states, but, quote, EPA notes that the other 14 days with ozone above the level of the next should also be assessed and given appropriate weight. That's at JA 1182. But EPA failed to do that for Jefferson. When it came to Franklin, EPA followed that statement by saying on five of the 17 days, Franklin contributed, and it goes ahead and rejects the state's recommendation and includes the portion of Franklin with a large source. There's nothing about, there's no comparable analysis for Jefferson. I see that my time is up. I've reserved one minute for rebuttal. I'd be happy to come back. Thank you. Thank you. The updated data for the St. Louis region shows that its ozone problem is much smaller than EPA had thought and centered farther away from Jefferson. That shifted the weight of the evidence by changing the context, again, which EPA assessed Jefferson. Now what do I mean by that? Well, the trajectories traverse Jefferson and then may go through an urban area with much higher emissions before reaching the violated monitor, before reaching the ozone problem. And this is at JA 1181. And once EPA realized that the problem was a lot smaller than it had thought and farther away, and keeping in mind that there is a high emission area in between Jefferson and the ozone problem, it was reasonable for EPA to give less weight to evidence of Jefferson's trajectory and Jefferson's emissions. Although there's no quantification of that, is there? No. The fact that some pollution starts on the wind and then picks up more, maybe appreciably more, doesn't mean that the original pollution didn't, in fact, travel to the city. But the question here is not whether there is any evidence that some emissions might have ended up at the monitor. When EPA examines these areas, it's going to see evidence supporting a range of different conclusions, and EPA's job is to figure out where the weight of that evidence falls. And it can be really hard. Jefferson was a close call. But all else being equal, when there's less pollution, it's reasonable to think that fewer areas, especially farther away areas, contribute to the pollution problem. And that's the rational connection that we need to prevail here. Would you say something about the differential treatment of Jefferson and Bowles Township? They're identical on all key factors, air quality data, emissions data, and back trajectories. They have similar profiles, but they are different distances. Well, where is there an explanation about why those different distances are maturing? I know they're different distances, but I didn't see any explanation for why those are significant from an environmental point of view. Well, EPA noted the fact of Franklin, the Bowles distance. There was a typo in there, but in... There was a what? A typo. There was a typo. APA said 20 kilometers. It really should have been 39 miles. But EPA has... No, but that still doesn't answer my question. I mean, it's one thing to say they're different distances. I get that. But why are those particular distances significant? I get that. This might not be written in the record with leading clarity. So I didn't miss it. It's not there, right? It's reasonably discernible. Oh, it is? Yes. How would I do that? You mean by the fact that EPA said that the miles are different and therefore we should assume that it thought that was significant from an environmental point of view? EPA noted the distance for Franklin, and this is the context of EPA's weight of the evidence analysis. It was noted in one piece of evidence, and it's reasonably discernible that it's weighing the evidence differently. Happy to answer any more questions? Thank you. What you just heard is post hoc rationalization of counsel. There's nothing in the record that indicates that EPA relied on the relative distances between the Franklin source and the Jefferson County sources. There's no discussion whatsoever of the distances of the Jefferson sources. The difference of 10 miles is negligible by EPA's own account. In the response to comment, EPA says that the maximum impact of sources is felt from 31 to 62 miles, and the impacts can go up to 124 miles. So if they think that a 10-mile difference in source impacts is relevant, they would have said something. But they have to explain their decision. The only explanation they offer is focused solely on three days, and it's on page 1186. It's the only place where they explain why they're excluding Jefferson, and they say it's further away from the violating monitor and less likely contribute to the stagnation conditions highlighted by Missouri on the three highest ozone days. There's nothing about the 14 other violating days, and it's not a rational decision on that basis. Thank you. Thank you. Next is Ottawa. Who do we have next? Ottawa? All right. May it please the Court. David Bach on behalf of Petitioner Sierra Club. I'll be addressing the Ottawa County, Michigan designation, and I have reserved one additional minute for rebuttal. The Ottawa County designation should be vacated and renamed because EPA neither performed a five-factor analysis nor explained why such analysis was not required. EPA refused to perform such analysis, even though Sierra Club submitted detailed comments showing that each of the five factors supported a finding that Ottawa was contributing to nonattainment in nearby Muskegon and Allegan County. Isn't the issue here the meaning of the word nearby? And haven't we said that they get to choose what nearby means, that they can use the narrow view or the larger view? So, General, I have three points in response to that. First, EPA never disputed that Ottawa was nearby Muskegon and Allegan until it filed its opposition brief. So this is a post hoc rationalization. In fact, its final technical support document contains a statement, a broad conclusory statement saying that other nearby areas do not contribute to nonattainment in Muskegon and Allegan. So they're acknowledging that these other areas are nearby. They're just refusing to analyze them. The second point of that is that we should submit a detailed comment showing that Ottawa contributed to nonattainment in Muskegon and Allegan, and this court in the Mississippi Commission case stated that if a petitioner shows that a five-factor, that's relevant to whether the area should be analyzed under the nearby standard. That's at 790F.3D1534. And the last point is that the weight of the evidence indicates that Ottawa is nearby, these two counties. It's sandwiched in between Allegan and Muskegon, the two counties with violating monitors. All three are in the same combined statistical area. All three are connected by Highway 31. The modeling shows air masses moving from Ottawa to the violating monitors in these nonattaining areas. Ottawa is the largest emitter of all the three counties. And the city of Holland, where the Allegan monitor is located, actually lies partially in Allegan and partially in Ottawa. In fact, I believe the violating monitor is actually across the street from Ottawa County. So as for the nearby question, we just don't think that – I mean, the primary thing is that it's a post-hoc rationalization, but we don't think the weight of the evidence would support it either. And if you're right about that, the proper remedy is a remand, correct? We are – I'll defer the further discussion of that to co-counsel, but certainly – Well, I ask it because you do say in your brief that – do I remember you saying in your brief that you want this court to say Ottawa is in nonattainment. How could we do that? No, I don't believe that's our position. I may have said that. So what is your position? So we agree that remand and – Oh, you did. Yes. All right. Okay. The Clean Air Act doesn't require EPA to analyze all areas in the country for contribution every time there's a violating monitor somewhere, just the nearby one. So when EPA sees a violating monitor, the threshold inquiry is what is nearby, and it answers that question by defining the area of analysis. And here's how it does that. EPA interprets nearby to mean the combined statistical area or, as appropriate, the core-based statistical area. And that interpretation was upheld by this court in the Mississippi Commission. Could you point us to the place and record where the agency explains its choice? Sure. Of the core base? Yes. Even if you're right that – and you are right that EPA has a discretion to use one or the other, it has to explain why it's doing that, right? Sure. So where does it do that? If you look at the beginning of the final designation for Michigan at JA 1110 and 1112, EPA discusses the scope of the area it would analyze for determining nonattainment boundaries, and it goes on to explain that it's going to take into account the region's unique meteorology and emissions locations to determine the scope of its approach to analyzing the five factors. And then at JA 1127 to 28, EPA has an extended discussion on regional meteorology in the context of western Michigan. Then at JA 1130 – And how is this an answer to my question? This is where it's explaining that we're going to look at meteorology to decide the area of analysis. In other words, what is nearby. My question was, where does it explain its choice of the core-based standard versus the combined standard? This is at JA 1127 to 28 when it's looking at the meteorology, and it saw that there were no – that other areas in western Michigan are not the problem when it comes to alligator and mosquito, and so can use the smaller area, the core-based area. And that is at JA 1130 and 1139 when EPA shows that areas of analysis in Ottawa is in neither area. I mean, when EPA – to figure out whether to use the combined area or the core-based area, EPA's very practical answer is, we're going to use the area that captures the likely contributing suspects, which then have to go through the holistic analysis. That's the area of analysis. And here, EPA used the meteorology and emissions information for the region to figure out who the likely suspects are. I thought that there were a little bit more separate inquiries than that, that there was an inquiry about the area of analysis, and that the factors you're talking about I thought were more going to the merits of the contribution. So there are overlaps in what EPA looks at, but these are different decisions at different stages made for different purposes. And let me – and again, this is kind of abstract, so let me try to explain using an example that's closer to home. Let's say you need to hire law clerks again, and you get a mountain of applications. You're not going to interview every single applicant. You're not suggesting this is a hypothetical, are you? No, of course not. What you do instead is you winnow down the pile based on certain criteria, and you end up with a smaller pile of the likely applicants, and you're going to bring those people in for interviews. And so the winnowing down and the interviews is roughly analogous to the relationship between defining the area of analysis and doing the holistic analysis that you're talking about, Judge Pollard. But isn't it the case that the EPA guidance treats the CSA as the sort of presumptive unit, and then on the way that it's worded is sort of in certain circumstances where it may be appropriate to use the CSA? So I would take that to mean you have, you know, flatland, open air, contiguous counties that you're going to do CSA, and then if you have, you know, something's on one side versus the other of a mountain ridge, that you might not. I think in this version of that guidance, EPA took out the word presumptive in that context, but it still says we're going to use the combined area or as appropriate. So I see what you mean by, like, you know, start with a bigger area. And what EPA did here was walk around and saw that there were no likely suspects in the combined area, in western Michigan, and so therefore it was okay to use a smaller core-based area here. Okay. Thank you. Thank you. Let's see, we have an interviewer here. Mr. Gordon. May it please the Court, my name is Neil Gordon. I represent the state of Michigan. I will address three points that petitioners made in their reply brief. First, the record demonstrates that EPA did, in fact, analyze whether emissions from Ottawa County impact the monitor in neighboring Muskegon County. Second, there is nothing in the record that shows that emissions from the J.H. Campbell Power Plant in Ottawa County reached that monitor on any exceedance day. And third, petitioners have waived the issue of whether ozone concentrations in Ottawa County exceed the ozone standard because they never waived that issue in their comments. In the limited time that I have, I will elaborate on the first two points. First, petitioners are wrong when they claim that EPA did not analyze whether emissions from Ottawa County impact the monitor in the city of Muskegon. In fact, both EPA and Michigan analyzed meteorological data to see if emissions from Ottawa County and from outside of Michigan contribute to the exceedance days in Muskegon. Michigan used the high-split computer model to chart the path or back trajectory of air masses on exceedance days. And on page 43 of its recommendation at JA333, Michigan concluded that emissions from Ottawa County showed, quote, no influence on the monitor in Muskegon on those exceedance days. And EPA did the same thing. EPA also used the high-split computer model, and it similarly determined at JA1130 that, quote, nearby counties do not contribute to the violating monitor in Muskegon. I thought that there was some evidence in the record that emissions from the J.H. Campbell plant exceeded 1% of the 2015 Primary Ozone Act on 43 different days at the monitors in Muskegon, Allegan, or Berrien. And that that plant is over a third of the carbon dioxide or the nitrogen oxide emissions in the county. So it's a big source, and I thought there was data showing that it contributed to exceedances. There is not. There is not in the record. They cite to one high-split back trajectory of an air mass that starts at 1,000 meters over the monitor in the city of Muskegon and some 40 miles away from that monitor travels over a small southwestern corner of Ottawa County. That one back-split trajectory by itself is not sufficient to demonstrate that Ottawa County should be designated as an unattainment because back trajectories by themselves only model the movement of an air parcel. It doesn't identify the emissions in that parcel. And petitioners provided no information about the emissions in that one air parcel for that back trajectory. They simply cite to a back trajectory, and that's not sufficient. And frankly, if you go to that back trajectory, which is at figure 12 in the TSD at page 29, that back trajectory does not, as petitioners suggest as a factual matter, actually travel over the J.H. Campbell power plant when you look at it carefully. So I see that my time is up. Okay. Let's see. Ms. Chan, 1.5 minutes. I don't have anything to add to Ms. Chan's argument, but I'm happy to answer any questions. What about the study that Sierra Club produced? I think they claimed that the EPA just didn't analyze it, sort of said it's outside, we're not going to look at it. EPA responded and said they didn't provide enough information. I mean, what Sierra Club does acknowledge is that some of that data is basically stale because it reflected in the 2011 emissions back before Campbell upgraded its facilities. And then afterwards, Sierra Club says, well, sometimes the Campbell plant still emits a lot. Well, okay, but what are those times? Because if you're emitting a lot on the first of the month and the exceedance doesn't happen until five weeks later, well, how is that emission relevant? And Sierra Club hasn't provided that data. And as Ms. Chan just explained, the trajectory analysis also doesn't connect the dots between Campbell and the violated monitors. Thank you. Thank you. I'd like to respond briefly to this question about the J.H. Campbell study. So we did acknowledge, we've always acknowledged that the emissions profile of this plant has changed since the study was done. However, regional meteorology has not changed. And this study showed up to 4.6 parts per billion going from the J.H. Campbell plant to Muskegon a few years ago. And so that suggests that the meteorology is moving pollution from this plant to the violating monitor. So the fact that the emissions may have gone down, there still is likely to be transport. And we also showed that this study had modeled greater than 1% of the ozone contributions at emissions levels that were still occurring after the upgrade. So we understand that EPA may not have thought the model was fully conclusive, but if it didn't believe that, it should have investigated the matter further rather than turn it in, rejecting what was the best available evidence of whether pollution actually moves from this particular source to the violating monitors. The other point is that there are many other sources in Ottawa. J.H. Campbell is about 40% of the NOx emissions, but there are other sources as well. So this study is showing a significant impact in the recent past from only one source in Ottawa would cause a rational decision-maker to take a closer look at the county as a whole. And the CBSA versus CSA designation, this has, in the last couple of designations, it's also been viewed as a CBSA, is that correct? So there's something of a consistent tradition of chopping up this area in this way? Your Honor, EPA cited to a, I believe it was a 1997 ozone max, discussing that. And from that designation, there's no actual discussion of how the designations were done. And all of the three counties were designated as non-attainment, so it's not really possible from that document to determine how the analysis was done. But at minimum, that was also a post-hoc point that EPA made. There's nothing in the decision document itself that ever said this county, which is sandwiched in between these two counties' violating monitors, is not nearby. And in fact, what counsel for EPA cited in JA1130 contains a statement that's saying other nearby areas do not contribute. So it concludes their statement, but it recommends that they're nearby. Thank you, Your Honor. Thank you. Good morning, and may it please the Court, Robert Ucali on behalf of the Boulder County Commissioner for the Center for Biological Diversity, National Parks Conservation Association, and Sierra Club, which I'll collectively refer to as Boulder County. I'm addressing the exclusion of Northern Welk County from the Metro Denver non-attainment area. Northern Welk County submissions are huge, but that problem alone is not enough to reverse EPA's decision. However, EPA is required to use a methodology that's consistent with other areas as well as rational. In this case, EPA chose to evaluate Northern Welk County submissions compared to Welk County as a whole. But that gives you a skewed analysis, because for Welk County as a whole, their emissions are massive. If you look at the table on page 118 of the opening brief, you see in the middle there's this huge bar, much bigger than any other, and that's Welk County's emissions. So if EPA had done its traditional approach of comparing areas that it intends to exclude compared to areas that it intends to include, it would have reached the conclusion that Northern Welk's emissions are massive. For example, it is in the non-attainment area, and Northern Welk County's VOC emissions are nine times greater. So EPA's approach was both inconsistent with how it normally looks at emissions, but also provided this skewed view. And even using this skewed approach, Northern Welk's non-submissions are 25%. It's not one or two or a small amount. It's still fairly significant. Turning to the statutory argument about how the 107D does not include the term significant, but there's no evidence in the record that EPA honored that difference. In EPA's guidance, they did say that their approach to determining which areas contribute is similar to their approach to analyzing rural transportation areas, but a rural transportation area statute uses the term significant. I think my phone is off. Thank you. Thank you. Good morning. Suki Hoshijima for the United States. EPA's partial non-attainment designation in Weld County was driven primarily by the unique topography and meteorology of the Denver area. Now, in terms of the meteorology, I didn't even see it relying on the meteorology in the agency's explanation. It's relying on it in the briefing and giving a sort of a de novo interpretation, but I didn't see that in the agency. That's not right, Your Honor. In the final TSD, EPA refers in several places to the closed basin effect. It is a meteorological phenomenon that is a result of the combination of the topography, the elevated terrain on three sides, and the air circulation patterns of the area. So when EPA is referring to the closed basin effect, it's referring to both the topography and the meteorology. And the topography, there was some back and forth and some sort of bit of keystone cops in where there was a ridge or if it wasn't a ridge. I mean, in fact, the ridge, the height of the ridge appears to be closer to the Palo Alto-Wyoming border, and EPA's own data shows the bowl includes Weld County, including the northern part. And so what I was referring to in terms of meteorology is high split data. And the high splits seem to show that as much as EPA's own information shows, that this is a bowl where you would think the highest emitting sources are in the mix, the highest emitting including southern and northern Weld. So the high split data does show some back trajectories that go over the northern part of Weld County, but it's many fewer relative to the rest of the Denver area in the interior. Why does that matter that it's fewer? Well, because EPA... We're looking for contribution. We're not looking for comparative contribution. Sure. So EPA is looking at the high split data, but the high split is a model of predicted air trajectory. But to understand high split, you have to take into account the other factors, such as here the topography. And petitioners aren't actually contesting this idea of a closed basin. They're not contesting the idea that emissions within the basin are kept inside of it and emissions from outside are not going to be contributing. All they're quibbling with is the line drawing about where the northern bounds of the closed basin is. EPA... And you don't seem to be contesting that there was an error in the original proffered description of that and that there's a kind of more of a high area and not a ridge in northern Weld and then open to the downland area. Well, Cheyenne Ridge, Your Honor, it's not a stark cliff that appears out of a flat area. It's not so easy to say, here's the inside of the basin, here's the cliff, here's the outside. Instead, it's a gradual slope. And Your Honor is correct that the high point is somewhere closer to the Wyoming and Colorado border. Is it your argument that the Cheyenne Ridge restricts the emissions? That's right. How does it do that? It's in combination with the air circulation patterns of the area. And it's a fairly complicated technical conclusion that EPA reaches by considering it identified four different air circulation patterns in combination with the elevated terrain it forms a basin. Now, again, petitioners aren't contesting this idea of a basin that restricts emissions. The question is just where EPA drew the line. EPA here had to draw a line as to where on the elevated terrain of Cheyenne Ridge it was going to end the nonattainment area. And there are many reasonable ways EPA could have drawn that line because there's not a single place where you can say this is the inside of the basin, this is the outside. EPA acted reasonably here by referring to a prior nonattainment boundary that was drawn in the same place as it was here in the 1997 and the 2008 rounds of designations. Where EPA had to make a judgment call about where in the elevated terrain it was going to draw the northern boundary, it reasonably decided that the nonattainment boundary that already exists and roughly corresponds to the northern part of the basin was a reasonable place to draw the line. Petitioners point out that there are other sort of equally high areas that are treated as in the basin, so the height doesn't really – it's not consistently treated. And the line itself is not a line that tracks really any feature, but it's just one straight parallel, so it feels a little arbitrary in a – kind of in a geological sense, at least that would be their position. And your response to that is, yeah, it's going to be a matter of degree, and we had to draw it somewhere, and it's a little straight, but good enough? So if you look at the map in our – page 55 of our brief, it's a copy of JA-1081 with red lines drawn to indicate where Weld County is. It shows that the line is roughly separating the yellow elevated part of northern Weld County from the greener lower down area within the basin. Now, exactly where to draw the line based on this altitude is going to be a judgment call. And EPA acted reasonably here. Thank you. Thank you. As to using the prior line, that analysis completely ignores the hydrological or fracking revolution. We just reached the 10-year anniversary of the fracking revolution, and so emissions, again, in northern Weld County are massive, and they are caused by oil and gas, which was enabled by fracking technology, which didn't exist in 97 and was barely used in 2008. So that's an arbitrary consideration. In terms of the basin, we didn't contest that concept because of EPA being entitled to extreme deference, but actually if you look at the high split lines, most of them that run through northern Weld start in Wyoming. Also on that point of the high split, it's not actually true that most of the high split lines start in the southern part. If you look at JA-1067 or 1068 or 1069, so for three of the monitors, there's actually more lines that run through northern and southern Weld than just through southern Weld. It's only the Fort Collins West monitor where there's a predominance of lines running through southern that don't include northern. And finally, on page 116, it's clear that the eastern part of northern Weld is the same elevation. There is no change in elevation between the non-attainment and the attainment. So this is... 116, is that a brief page or a JA page? A brief page. We reproduced the... Right, got it. It's actually the same picture as council predicted. On the eastern part, which is the lower part of the page, there's no change in elevation. I think my job is done. Thank you. Thank you. Good morning, Your Honors. Howard Lerner for Petitioners Environmental Law and Policy Center and Respiratory Health Association, and I'll address how EPA changed the Lake County designation from the initial non-attainment to the final partial attainment, even though there were no changes at all in the facts or the scientific data. This was part of a pattern of unjustified results or interchanges that trumped the scientific data. It should be reversed. EPA's last-minute change is treat only northern Lake County as non-attainment, and this is analogous to the Catawba County case, 571 at 3rd at 51, where the court reversed, and I quote, because EPA's rationale changed between the initial designation and the final designation with no apparent change in data. The process matters. No data changed here. The record data shows that all of Lake County contributes to attainment. Isn't EPA – it's not like EPA has promulgated a rule and then is changing a rule and needs to justify. It puts forward a proposal, and its thinking and analysis and clarification based on input refines its analysis. It can change without changed data, no? Do you disagree that the standard really is looking to the final designation and asking, is it rational? Not whether the change from somehow the capstone original initial designation. We disagree only in the following way, and this is Catawba County and this is the Mississippi Commission case. EPA made an initial designation based on facts and scientific data in the record. Then there was a last-minute switch in which EPA, with no evidence being submitted, no party, the state of Indiana didn't recommend it, all of a sudden decides at the very end it's going to include half and take out somewhat more than half, and looks at only some of the factors as opposed to all the factors. But it pointed out – you're right, there's no new data, but it pointed out that Northern Lake County contains almost all the point sources, most of the population, overwhelming percent of the population, 98 and 99 percent of the volatile and NOx emissions. So why isn't – I realize there's no change in data, but why isn't that observation sufficient to justify? Because of the five factors, that's only part of the picture. The other part of the picture deals with traffic. Crown Point, the county seat, is in Southern Lake County. The I-69 interstate highway runs between Northern and Southern. EPA didn't look at traffic on a township level, even though Lake County ranked fourth overall for vehicle miles traveled in the Chicago area. On the other factors, there's nothing about the meteorology or the geography that keeps pollution from Southern Lake County from going to the monitors that are violating in Chicago. So if you cherry-pick and you look at some of the data, I will agree with the court. It points in one direction. But the very reasons that EPA initially designated the whole county as being non-attainment was based on the five-factor test, and looking at the five factors, it found that all of Lake County contributed to monitors that were in violation. And I'm going to quote, the analysis shows that emissions from these areas are capable of transporting to the locations of violating monitors. We cite the record at page 13 of our opening brief. So we don't dispute that most of the point sources are indeed in the northern part of the county. But there's a lot of traffic throughout the county, and that's a contributing factor. As the court found in the Mississippi Commission case, in which Indiana made almost the exact same argument that was rejected here by the court, it's not a matter of whether Southern Lake County is a little bit less than Lake County, Northern Lake County is more. So long as Southern Lake County contributes to the violating monitors, that is sufficient that it's part of non-attainment. So what we've seen here is that sort of cherry picking. If I could, I'd like to leave my minute for rebuttal, but I'll address the court. EPA's last-minute change is like that struck down by the court in Catawba County. It was arbitrary and capricious, not in accordance with law. The flawed decision based on no changes in the facts or scientific data should be reversed. Thank you. As Judge Stadel pointed out, EPA's partial non-attainment boundary in Lake County captures virtually all of the county's emissions. But what about Mr. Lerner's point that, yes, emissions, point sources, but not traffic, meteorology, or something else? EPA took that into consideration by putting into its final designation a map of vehicle miles traveled. Is that right? A map? Yes, it's at JA1286. Yeah, right. I should hear you. Go ahead. And at JA1286 is a map that shows 12-kilometer grids across this entire area showing the vehicle miles traveled. And it shows that the northern part of the county, which is what EPA designated as partial non-attainment, contains most of the vehicle miles traveled in the county. That also tracks with EPA's explanation that in addition to the point source emissions, the majority of the county's population is concentrated in the northern portion. It was reasonable for EPA to think of the 88% population in the non-attainment area as a proxy for the non-point source emissions in the area. In short, there's very little for petitioners to quibble with here because the non-attainment area is capturing the emissions that would need to be controlled. And they exaggerate when they say that only a small portion of Lake County was included in the non-attainment area. As a practical matter, if an area that doesn't have a major point source is designated non-attainment, what implications? What implications for traffic? I mean, I understand there would be implications for new development. Right, and the consequences of a non-attainment designation depends on the classification of the area. And in every designation we're talking about here, the classification is marginal, which is true for Lake County and all of the others. And it's hard to say what exactly the consequences would be for a non-attainment designation for the southern part of the state. At least petitioners haven't made any kind of argument about that. As Judge Pillard pointed out correctly, this is not a situation where EPA is changing from a previous final designation to another final designation. This is a process in which EPA takes input from states at a public comment period and is thinking about the proper designation along the way. And EPA does not have to justify the reversal itself. All it has to do is to justify the final designation in light of the facts in the record. But Lake was, in the last designation, finally designated the entire county as non-attainment, right? That's correct, Your Honor. And that was under a different factual record and a different ozone standard. And so it's not... It's gotten less developed in the south or it's gotten... I'm not aware... Standards more demanding now. Right, and I'm not aware of what information in the record there is about development in the southern part of the state. But what EPA has to do is it has to justify the final designation on the record, and it's justifiable to draw a line that captures virtually all of the county's emissions. If the Court has no further questions, I can rest. Okay. Thank you. Your Honor, I'll respond briefly. As counsel said, there's more transportation in the northern half, but there's plenty of transportation in the southern half. Indeed, there's a proposed major new tollway, the Ileana Tollway, being proposed through the southern half. What about the map you pointed to? There's a map that's been put in by EPA, and not surprisingly it shows the current highways that go on northern part of Lake County have more traffic. There's a major interstate, I-69, that runs from north to the southern part of the county. There's a proposed new massive highway, the Ileana Tollway, that would go through the southern area that's been excluded. The population is growing in the southern part. So when you look at this all, we can't quibble with counsel. Your Honor, in this court, what's the basis we would have for this is all, this is a very deferential standard. I understand your argument, but how would we explain finding that EPA's analysis here is inadequate? What would we say? What you would say is that EPA made a last-minute change without any substantial change in either the facts or the scientific data. What EPA did here was— But we found persuasive its arguments that it's in the north where there's most of the point sources and traffic and emissions. What they found was, first, most of some of the factors was in the north rather than the south, but not all of the factors. All the factors cut the other way. And secondly, with regard to the standard is not whether the south is less and the north is more. If there is a meaningful contribution from the southern part, that means it's in nonattainment so long as it's contributing, and that's the facts in this record. Thank you. Thank you, Your Honor. Let's see. To Doerr and Sheboygan, right? May I please the Court? Ann Reeks for Clean Wisconsin. I'm going to discuss the designations of Sheboygan and Doerr counties in Wisconsin, and I'd like to reserve a minute. EPA's final nonattainment designation boundaries disregard contribution from nearby sources of ozone precursors. EPA adopts instead a Wisconsin approach for Sheboygan that runs counter to evidence before the agency. It fails to include nearby contributing areas,  as well as portions of the I-43 corridor area, Interstate 43, which the record shows is a major source of precursor emissions, and EPA does this without any explanation. Other than that, EPA relies on Wisconsin's approach, even though all elements of it are discredited by EPA's own technical staff in the response to comments document, and even as EPA says it can't validate portions of that model entirely. EPA fails to perform its duty to evaluate evidence it relies on, and at the very least, it relies on a model it knew was not up to the task. EPA bases the final nonattainment area along the lake only on the distance ozone travels in from the lake, not on the distance precursors travel out from the land, over the lake, along the lakeshore. In the record, even Wisconsin at figure 3.5 JA-428 and the discussion on 429 shows that trajectories flow from the west in the morning out over the lake, form ozone over the lake, because these are precursor carrying trajectories, and then in the evening, the ozone flows back in. EPA draws its arbitrary boundary, its 2.3 mile boundary, only on the distance that the ozone travels in, not the distance for the trajectories that the precursor emissions travel out, including from that large point source, which is directly west of the Kohler-Andre Monitor in Sheboygan. EPA's final boundary adopts Wisconsin's assumption that ozone behaves in a linear fashion, even though EPA's own record says over and over again that ozone is complicated, it's complex, it's nonlinear. Even Wisconsin ignores its own graphic on figure 4 in its brief, and we produced it in our reply, showing that there are near nonattainment conditions in areas well west of the 2.3 mile boundary. The net result in Sheboygan is an unlawful and arbitrarily thin nonattainment area. In Door County, the final nonattainment area also ignores contribution. It absurdly is limited to the boundaries of a state park, dropping out even the evidence of vehicles traveling to and from the state park and vehicles in the southern part of the peninsula, which EPA's proposal was to designate nonattainment. Ms. Weeks, if we were to find the Sheboygan boundary to be adequately supported, would that affect the other counties in which the lake effect phenomena is being relied on, the ones that are being sent on voluntary remand? Well, EPA claims so. It talks about how because there's a non-violating monitor further inland than this one, and it draws this linear line between the violating monitor and the non-violating monitor, this is the Wisconsin analysis, and because the lake shore is the same up and down the coast, that it can adopt the same methodology for other counties. However, that model doesn't reflect reality. It doesn't reflect the precursor emissions. It doesn't reflect the contribution. And that's contrary to statutory requirements that contributing areas have to be included in nonattainment. And I can see that my time is up. Thank you. I will take three minutes to address Sheboygan, and Mr. Hoshijin will take the remaining time to address Doar. I'd like to start by explaining exactly what we're disputing over in Sheboygan and then address Petitioner's arguments about contributions, evaluation data, and the linearity point. The Sheboygan dispute comes down to 0.9 miles, because on page 60 of the opening brief, Petitioner's concedes that there is a, quote, thorough analysis to support EPA's initial designations in Wisconsin. For Sheboygan, the only difference between the initial and the final designations is the width of the nonattainment area. In the initial, it was 3.2 miles. In the final, it was 2.3, and that's the 0.9 miles that we're fighting over here. Petitioner's focused on Sheboygan's own emissions, but the zero-out comparison shows that Sheboygan's own emissions have negligible impact on the violating monitor, plus the record shows that most of Sheboygan's sources, including all its major sources, and the heaviest traffic are north of the violating monitor, see JA 1327 and 1330. Meanwhile, the model shows that wind is coming to the monitor from the south. This is at JA 1331. I understand that part of the change, and it's 0.9 miles, but EPA actually seems to put a lot more stock in this than just Sheboygan because it then relies on this, you know. Sheboygan is sort of the poster child for the lake effect theory, and the thing that I'd really like to hear about is that the final designation talks about the lake effect theory, and EPA is candid about saying that aspects of these claims are difficult to fully evaluate because EPA does not have the details necessary to fully review the emissions direction modeling analysis that these claims are based on, and given that, I just wonder what EPA's position is on its ability to embrace that, and I know that you were hesitant to embrace the Sierra Club study when you were looking at, was it Ottawa? I think you're reading that material from JA 1333 when you keep looking at the different analyses that Wisconsin submitted, so let me think about it. Wisconsin submitted multiple analyses, and EPA relied only on some of them, and when EPA was talking about it couldn't evaluate the analyses, it was talking about the source apportionment modeling and the so-called 10% induction method, and it dropped footnotes at JA 1333 to explain its concerns with those two analyses, and then it didn't rely on them in the conclusion page later. So EPA was not saying it couldn't evaluate other aspects. So when you talk about the zero out Sheboygan run, where is the data that EPA used to evaluate and verify that that was something that it could rely on and that it understands, or the statement that it did that? JA 454 to 56 is Wisconsin's discussion of zero out comparison, and then as I just explained, the record elsewhere with the location of the point sources in Sheboygan and traffic as well as the trajectory supports the zero out finding. But the zero out finding itself is not something that EPA looked behind. It accepted Wisconsin's... EPA looked at it because Wisconsin provided a detailed discussion of how it did that in its recommendation, and EPA thought it was fine to use, plus there's separate record evidence supporting that conclusion. So that's, I mean, petitioners talk about all these omissions in Sheboygan, but really the evidence shows that there's no connection between those omissions and the violating monitor. I also want to be clear that in the initial designation, that major source that Petitioner is talking about is actually outside the initial nonattainment area, and you can see this at JA 632. On the final point on linearity, that argument has been weighed because it wasn't made an opening brief, plus the 2.3 miles is calculated not from a linear equation based on a linear relationship, but from a power fit equation, and this is at JA 462. What? JA 462. Okay, power? Power fitting. It shows a curve instead of a line. So that was not calculated from a linear relationship. But it is linear in the sense of a constant distance from the shoreline, as was the... It's not a constant distance. It shows a curve. Right, but I'm saying it's a constant distance. So there's the shoreline curve, and so does the line. Isn't that right? I mean, when you say 3.2 miles, it's 3.2 miles all the way along. It's roughly 3.2 miles based on the road. 2.3 and 3.2. Right. Both of them are sort of roughly... It's not a straight line. They're equally linear in that sense, because each of them is expressed as a constant distance from the shoreline. Roughly a constant distance, yes. Okay. Thank you. Thank you. Let me quickly address Door County, where petitioners agree that only part of Door County should have been designated non-attainment. So the scope of disagreement here is pretty narrow. EPA ultimately limited the final partial non-attainment area to the immediate surroundings of the violating monitor. Petitioners just want slightly more of the county designated. Now, it's important to note that EPA's rationale for Door County is fairly different from the rationale that it used in designating the other Wisconsin counties. EPA in Door County relied largely on the unique geography of the Door County monitor, which is that it's on the tip of a peninsula, particularly exposed to the lake breeze effect, and that Door County itself is particularly rural and has low emissions and low population. So there is no reason for EPA to believe that the rest of Door County contributed to the violation at the peninsular monitor. So petitioners are ultimately disagreeing with EPA's line drawing. They think that some sources within the northern portion of the county should be included within the non-attainment area. But because EPA overall concluded that the county's emissions were low as a whole and not a major factor here, it was reasonable for EPA to not take into account those sources. The question I have is, is the claim that the lower part of the peninsula is producing? Or I thought it was more that given the violating monitor on the peninsula, that it's hard to say the rest of the peninsula is not equally experiencing exceedance. I can't speak to exactly what the petitioner's claim is. But as to EPA's conclusion, it was that there was no information in the record that suggested that any other part of the county should be considered non-attainment for either of those reasons. And the peninsula was previously designated based on that one violating monitor in past designations. I don't recall exactly what the past designations were, Your Honor. And the question, I suppose, is could EPA, if it were so inclined, do this kind of, you know, just draw a little ring around a point source rather than consider the broader area all over the country? I mean, one assumes that emissions are experienced not just by, I'm sorry, not a point source, but a violating monitor. Right. That a violating monitor is indicative of something broader than just the very immediate area. What am I missing? And for EPA to do so, that would have to be supported by the multi-factor analysis, which here showed a monitor that is particularly exposed to the lake breeze. It's on a higher portion of land. It's surrounded on three sides by water. And that means that it's being affected by emissions from the lake in a way that there's no reason to believe other parts of Door County are. I'm sorry that I'm being a little obtuse about this, but where we had the lake shore and the primary evidence of violation that the agency was relying on was that the lake breeze effect would, in fact, come inland across the whole coastline. And so the question is, well, why wouldn't you at least have a 2.3-mile lake breeze effect along Door County? I mean, the lake breeze is an effect that actually brings emissions and in EPA's view causes a violation where there aren't violating monitors, just as is the case with Door County. And as to that question, I can say for certain that's not what the petitioners are arguing here. Petitioners haven't made that argument that it seems the extent of the violating air should be 2.3 miles within Door County. No, but I'm just looking at the logic of the reliance on the lake effect. Where polluted air is washing in and out over land, the fact that this is a spit of land out on the lake wouldn't seem to ameliorate that. And so I'm missing something. EPA's conclusion was just that the monitor is particularly susceptible because of its placement, perhaps in a way that other parts of – there wasn't evidence to believe that other parts of Door County were similarly susceptible. Okay. Thank you. Thank you. Very quickly, I'd like to respond to some of the questions. I'm going to start with Door. We want the portion of the county containing ozone precursors to be designated on attainment, which is what EPA had proposed in its original document. And in its final document, it decided that it would ignore high-level trajectories showing a precursor transport from the southwest and areas that contain the point sources and a lot of traffic in the southern part of the county. For Cheboygan, the width of an unattainment area, we didn't challenge that because of the extreme deference this agency gets. The eliminated large VOC source is right near the boundary. It would have been eliminated no matter what, but nevertheless, it's eliminated from non-attainment. EPA definitely drops out portions of the I-43 corridor, which it knows are sources of vehicle miles traveled. And it also ignores that its own record says that on exceedance days, the transport is from the south and southwest over land. The final document at JA – I mean, the response and comments document, I'm sorry, at JA 1212 to 1215 is the staff's critique of the Wisconsin submission. The final document does not say what – the final decision document doesn't say what of the Wisconsin analysis they relied on. It just says, you know, considering what these things are that we listed and considering the Wisconsin analysis, we have changed our mind. It doesn't really analyze or tell us what portion of the model that they relied on. But in any event, all of the portions of the model can be shown to be lacking. And with that, I would like to just ask for both the door and the Cheboygan designation to be – or the attainment boundaries to be vacated. Thank you. So I think we're moving on now to the question of remedy. Yes, let me know. Okay. And – So Anne Weeks, please report. I don't know if we want to start the clock again. I am going to split my five minutes with my colleague, Mr. Lerner. I'm going to start with three just to sort of lay out where we see this going and he will finish up. We seek vacater, not remand alone. For all of the attainment area boundaries, we are challenging. As you've heard from all of my colleagues, EPA is engaged in a results-oriented designation process, ignoring contribution. That's a statutory problem for them. And that should be enough under your cases to justify vacater. What's the practical implication of that? Is the assumption that it goes back to its previous designation or it becomes undesignated? And if it becomes undesignated, is your only concern a concern about deadline? Well, that's a major concern in this case. And our concern about deadline is that it would become – I have two answers. The vacater would trigger again the deadline, which is already passed. Would it trigger the deadline? I believe so, Your Honor. It's already been triggered. They're well overdue in designations. But it wouldn't trigger a new deadline, right? Well, it would trigger the situation at hand before the designations were issued, which is that they were having to respond to a nondiscretionary duty to issue designations. Could that problem be solved if we impose a deadline, a remanded deadline? I think it's within your power to do that. I'm not sure that this works. Do you know of a case where we've ever done that? I know of inmate court communications where you've said that you don't want to have to do that and it ends up in a mandamus situation where EPA foot drags when you simply remand. I think the district court in this case has exclusive jurisdiction over deadlines and would probably be the place we would have to go if you didn't tell the agency what to do. I am not confident that you would want to tell the agency what to do on deadline in this case. I mean, in some cases, at the end of the opinion, we've reminded everybody about the availability of future mandamus, really. That's correct. But we have to apply the allied signal standard. Yes. So how do you... I can see my time is up. The seriousness of the error. That's the first one. Well, I think my colleagues have shown serious deficiencies here. At the very least, failing to include nearby contributing areas is a serious misinterpretation of how the statute reads. I'm sorry to interrupt you, but you're running out of time. What's the closest... Is there a case... Can you cite a case where we have found a designation to be arbitrary and capricious and vacated it? A designation, Your Honor? Yeah. An area designation, yeah. Not an area designation, but certainly other situations where... But not a designation. In other words, there's no case where you know of where an attainment designation, which we found arbitrary and capricious, we vacated. No, Your Honor. I think here we're talking about a statutory... And just to continue... Disregard statutory... Judge, I'm not sure I get the difference between... These are areas that are in attainment, correct? Yes. So if we vacate, they still know... What's the consequence of that for environmental regulation right after the... Well, the 2008 designations are still in place for those areas. And in some cases, EPA has replaced a non-attainment designation on a 2008... So there's the answer to your question. If we vacate the non-attainment designations, then the... I'm sorry, the attainment designations and the non-attainment designation goes back into effect. Is that what you're saying? Under the 2008 standard, or if it's an attainment area under the 2008 standard, then that would go back into effect. And our concern is making sure that EPA acts in a fashion that reflects the important public health considerations that are at play in this case. This is ozone, causes respiratory illness, even premature death. I suppose we say all that in order to even say, you know, just quote what you just said, that they need to move quickly to reflect the serious health issues in effect and leave it at that. Would that be okay? If you simply remanded, Your Honor, we don't have the opportunity to go back to district court and force them to meet the deadlines that have already passed under this. We've had to go twice already in order to get the designation issued. EPA did this in two batches, one just the attainment areas back in the fall of 2007, I guess, and then we had to go back again to get the non-attainment areas. There's a serious deficiency here in that EPA is trying to make the smallest possible non-attainment areas and to foot drag. And that vacator is definitely warranted here. Okay. And what makes – I mean, this was not apparent to me from the briefing. What makes you confident that if it's vacated, instead of just being undesignated, it goes back to the 2008 status? Well, I think it's – I think the understanding is vacator brings back the status quo ante, and that is the status quo ante in this case in these areas. Okay. Thank you. You're welcome. Thank you. Your Honor, it's Howard Lerner for Petitioners, and I'll just make two short points. First, facts matter. And secondly, justice delayed is justice denied. As Judge Griffith recognized in In Recor Communications 531F3849, future panels should consider the alternatives to open-ended remand without vacator. And in that opinion, in response to the Court's question, there were a number of cases in which are cited where the Court prescribed a certain number of days for the agencies in those cases in which to move forward. So there is some precedent here. Now, that, as my co-counsel said, not specifically in the ozone monotainment cases. What was the name of that case? In Recor Communications. Wasn't that a mandamus action? It was a mandamus action. Well, that was completely different. Of course we have authority under mandamus actions to impose deadlines. This is not a mandamus action. This is not a mandamus action. So the question is, do you know of any case where we would post a deadline in a non-mandamus Clean Air Act case like this? Your Honor, I'm not aware of that right now. And what authority would you cite for our authority to do that? Let me go back to what Judge Griffith said in Recor Communications. That's a mandamus action. It's a mandamus action, but I think fairly read Judge Griffith's concurrence, and Judge Griffith knows what he meant to say. It would be me to say it, was that future panels should consider the alternative. Future panels in mandamus actions, right? Well, I don't think that's quite the purpose. The purpose was to avoid mandamus, and that's the point here. You know, what that opinion says leads me to question the wisdom of open-ended remand without vacature, because otherwise you then get to mandamus. The purpose is to avoid that situation. And in this case, where we've seen the rather extraordinary letter from the U.S. EPA Administrator requesting the Illinois EPA Director to please make a request of a switch to attainment, and where we've seen the delay problems as expeditiously as practicable as the standard here, we believe this wisdom compels vacature. Great. Thank you. Thank you, Your Honor. Vacature is the wrong remedy here, given Petitioner's stated concerns for two reasons. First, for Sheboygan and Doar, there is a mismatch in what Petitioners are challenging and what they seek vacature on. As I just explained earlier, Petitioners have no problems with EPA's initial designation of Sheboygan and Doar, so in other words, they agree that much of the attainment area there is just fine, yet they want you to vacate the attainment areas in those two counties. If we agree with you, if we don't vacate until remand, can you, speaking for the agency, give us any assurance about how long this will take? We don't know how long it will take because we don't know what, if any, errors this court will find and how many designations EPA will have to do on remand. What I can tell you is, in response to Petitioner's concern about timing, I mean, I hear them. The problem is they are assuming that EPA will act illegally on remand by unreasonably delaying, but you can't assume that. The timing issue is not right yet, and you shouldn't use vacature. Well, there has been a delay problem in these cases, right? They've had to go to court twice to get these issues. That was over a completely different volume of designations, and just because EPA didn't have time to finish hundreds of designations, this is a northern district California case, that says nothing about whether EPA will drag its feet here when we just have a handful of designations. And if the issue ever ripens, Petitioner's have a remedy. They can sue for unreasonable delay in district court. 7604A allows them to do just that. Also note, too, that the 2008 designations, the designations for the 2008 standards, are in place no matter what you do here. So I just wanted to clarify that. Unless the board has any questions about the designations that we are defending, I'd like to very briefly address the designations. When you say the 2008 designations are in place no matter what you do here. They're not being challenged. Well, so in Door County, for example, where in 2008 a bigger part of it was designated on attainment, and then the current designation is just in the tip, so does that mean that the part that's not in the current designation still has to meet the 2008? Yes. It's still treated as non-attainment with respect to the 2008 standards. .75, and then it's only with respect to further bringing it down. The current designation, yes, that's the current designation. Russian dolls in terms of the standards apply. The old standard continues. Yes, the old standard continues. It's not put into attainment in that other area. It's only attainment with respect to the new standards. Correct, yes. Okay. And do we have any authority to impose a deadline in remand? No. I mean, the case on point here is Catawba, where the court did find a designation to be arbitrary, and it remanded without vacature or without setting a deadline. But did we say in that case we didn't have the authority to set a deadline? I don't believe you said that, and I haven't found. That's pretty critical, isn't it? I don't know of a case that says you have the authority to set a deadline. And as you say, that assumes that EPA will be delaying on remand, and you can't assume that. I do want to make a very quick point about the designations for which we're asking for volunteer remand. The EPA allows the court to set aside agency actions found to be arbitrary and capricious, which requires a ruling on the merits against us, and if you grant the remand request, then those designations should not be vacated. Thank you. Thank you. Very quickly, petitions are not asking this court to impose a deadline, just to be clear, on EPA's action. You want us to vacate. We want you to vacate. But suppose we decide to just remand. Well, it's – unfortunately, EPA's – You don't think we have the authority to impose a deadline? I'm not – I wouldn't say that you don't have the authority. I would say that your equitable discretion on a remedy is pretty broad. If you would like to impose a deadline, I wouldn't say no. That deadline should be as expeditiously as practicable, and it should not be – But you're sourcing that authority in our equitable power of the court, right? Is that what you just said? That is where you would find it if you chose to do so, sir. I believe that, you know, under the statute, technically speaking, the district court has authority over these deadlines, and the deadline in 107 is as expeditiously as practicable, and not later than one year after the new standard is in place, et cetera, et cetera, et cetera. Unfortunately, what EPA – The problem is we've blown through those deadlines. Oh, yes. Yes, you have. But that doesn't mean they wouldn't spring back into place. I mean, I think that it is – I don't think it suffices to say, as EPA suggests, that, oh, well, unreasonable delay is an option for them because an unreasonable delay suit has a 180-day notice period. You have to wait for, what, 18 months under your case law before you can even bring one. I mean, this is public health here. I think your track case says where public health is an issue, delay is really important to consider, and here we've already had quite a bit of delay in – Your Honor, I'm talking simply about the fact that public health matters to our clients and their breathers. You understand what I'm asking, of course. Yes, I do. I absolutely do. I think that a remedy of remand alone is just going to invite agency foot-dragging. The agency has evidenced here manifestly an interest in the smallest possible nonattainment areas, and why they would want to speed up to enlarge those is just not apparent to me on this record. So delay is a concern to us. Delay is a concern to anyone breathing in these areas. I would want to ask if the court wishes further briefing on the question of your authority to issue deadlines on a remand. We'd be happy to engage in that. Well, we'll let you know whether we need that. Okay. Thank you, Your Honor. I have – unless you have further questions. No. Appreciate it. Thank you. So now we're on to the last topic, voluntary remand. Mr. Grisham? What? I'm sorry. I don't think there are any questions. Mr. Lurado, did you have any time left? Mr. Lurado, yes. Oh, then I'm sorry, Mr. Lurado. My apologies. I thought I'd get through this whole thing without making one of those mistakes. Your Honor, just one point. I clearly didn't make it. For all the reasons this week said and for what we've briefed in our reply brief at pages 57 to 61, we believe in the circumstances of this case, vacateur is appropriate. On the other hand, we do hear the court, and if the court is moving in a different direction, we are pleased to submit supplemental authority on how the court might manage the process so that we get progress from the agency in the words of the statute as expeditiously as practicable. Justice delayed is justice denied here. Public health is at stake. If the issue that's coming up from the perspective of the court is the path of a deadline in which the agency must act, we would be pleased to brief that if the court wants supplemental authority. Thank you, Your Honor. Thank you. Okay. Now we go on to the last topic. May it please the Court, Aaron Street on behalf of the El Paso Intervenors. We're urging the court to reject EPA's request for a voluntary remand, breach the merits, and deny the petitions for review. In my time this morning, I'd like to touch on why EPA's request does not measure up to the standard in this court's case law for voluntary remand and then turn to two specific statutory provisions that cut decisively against remand in this particular context. In this court's 2017 decision in Lemnia versus the Department of Energy, the court quoted a treatise that I think correctly encapsulates this court's case law on voluntary remand. And the court said that voluntary remand is appropriate when, quote, the agency recognizes deficiencies in its decision, explanation, or procedures and asks the court to remand the case back to the agency so that it may correct the deficiency. Now the agency doesn't need to confess error, but it does need to specifically and concretely identify some concern either on a statutory, procedural, or factual basis about the designation. And it has utterly failed to do that here. All it has told this court is that it may be beneficial for the court to receive additional further explanations about the El Paso and other designations. It hasn't told the court where it might provide additional explanations, why those may be needed, much less identified any substantive defect in the designation. And indeed, we think on this record and on the proper standard of review of deference to the EPA, we're at a loss to see why the EPA is not just defending this rule on its merits. Well, but the fact is it isn't. Right? I mean, that's the problem you have, is that it has chosen not to defend these designations on the merits, which leads me to ask, it's hard for me to see what the basis is for us going ahead and resolving on the merits, a standard that the agency is no longer defending. So two quick points on that, and then I'd like to argue why the statute cuts in favor of that result. But under this court's case law, certainly the agency has the prerogative to ask for a remand, but it must identify some reason based on the record, the facts, the statute that supports that. Also in this court's utility solid waste activities group case, the court did take into account the prejudice to the non-moving parties. And there the court had before it a party that wished to continue litigating and to vindicate its position, and the court said we're not going to accept the voluntary remand when there's a party before the court that's vindicating its position because we would have the same undue prejudice here, the state would have to continue litigating a rule that it believes is justified. Why isn't it enough? It says this would give it the opportunity to supplement the record or modify the designations in ways that could move the challenge or at least narrow the issues. Why aren't all those sufficient for a court to grant voluntary remand? They are all conserved judicial resources. Basically what this is saying to us is, look, court, we can either move this or we can give you a better record or narrow the issues. Why isn't that enough for us to remand? This court has never accepted that. I wasn't asking for a case. I was asking you why isn't that when we're looking at considering the question of judicial resources and why is judging? Why wouldn't we accept an agency's invitation to provide us with a better record or to narrow the issues or maybe even to move the case? Because it only conserves judicial resources if there's some reason given to this court to believe that that will happen. But they've only asked for it in several cases, not all of them. Correct. So... And I would say also the prejudice... I would agree with you if they had asked for the whole thing. With this you would say, well, that's a little suspicious. But they haven't done that. They've chosen to defend quite a few of these other merits, but not these. And if the agency were here giving some defect in the rule or some concern... Well, you're just repeating the argument at the beginning. You're not responding to my question about preserving our own resources and ensuring the quality of our decision-making by having the most well-developed record possible. So I think I'm not going to convince you with my previous point, but I think... That's why I asked you my question. Correct. And I understand, Your Honor. And so I think the prejudice to the parties still comes into account. But I think there are two steps... That I understand. Right. That's one clear response to what I said. Yes. Which is we have to consider the prejudice to the parties. And what is that prejudice? Well, the prejudice to the state is that it has to continue defending its rule, its designation before the agency and potentially again in this court when it's already justified on the record and under the statute. But there's no substantive prejudice. It's the fact that you have to spend time in court or in administrative agencies, right? That is the prejudice to the state. That is the prejudice, I see. The prejudice to the industry interveners is that they will now labor under a cloud of uncertainty while this remand goes on for who knows how long. And whenever it makes an investment decision or a planning decision about a beneficial expansion, it won't know whether it will be subject to the additional permitting and controls requirements that would come under a non-attainment designation. Don't... I mean, don't... This is a law... Clean Air Act... It's constantly... Standards... Standards are constantly being changed. Designations being reconsidered. This is a process that goes on indefinitely. I mean, states have to participate in the process and this is just an uncertainty that seems to me to be built into the statute and the way it's structured. I don't disagree with that as a general matter, but it is the prejudice that's at issue in this case that's similar to what was at issue in Utility Solid Waste Group. And if I could take... Which... Which of your cases are you... I'm sure you said it is, but... Utility Solid Waste... So many cases that are called Utility Solid. It's the 2018 version. It's 921-5-3. And if I could just take one minute where I think the statute and Clean Air Act is particularly relevant to disallowing the remand here. Two very quick points there. We've heard from our friends that the statute requires EPA to promulgate the state's designations as expeditiously as practicable. If EPA can't tell us what's wrong with these designations, they're running directly into that framework if they're asking for a remand. Now, sure, if there's something wrong with it, they can go back and fix it. But otherwise, they're supposed to promulgate these as expeditiously as practicable under the statute. The second quick point there is that the Clean Air Act provides a specific mechanism for EPA to revise existing designations, and that is under 7407-D3A. It says that if the administrator has... The administrator may at any time notify the governor that available information indicates that the designation should be revised. And then it goes through the... Why don't you finish up quickly? Yes, John. Finish your sentence. Thank you. So that specific prescription, how the EPA is to revise its existing designations, cuts decisively against short-circuiting an ongoing petition for a remand. And what are the built-in aspects of that process that you're pointing to that would not be available under the voluntary remand of the EPA? Thank you. I'm glad you asked, Your Honor. The statute expressly says that the administrator has to provide public notice to the governor with the reasons for why it's considering the redesignation. We have no idea what those reasons are right now. So that lets the EPA do its statutory homework and do its due diligence and provide notice to the parties of what it wants to do rather than short-circuiting the process before this court. Thank you. Good morning, Your Honors. May it please the Court, Gabe Johnson-Karp for the State of Wisconsin. Wisconsin opposes the EPA's request for voluntary remand here, but because we believe that EPA got it right in its final technical support document. Here, the agency has failed to explain anything, as Mr. Street just told the Court. There's no explanation of why it needs a remand, what it would do on remand. And so the agency – Well, it hasn't told us what it would do, but it's told us why. It says it can improve the record, might be able to moot a case. It's given reasons. It hasn't just said, please remand. Your Honor, I think it's – And it's picked the subset of cases to do it. That reason, I think, doesn't give really any indication of what it sees that needs fixing here. And that really goes to the core of my argument, which is Wisconsin doesn't believe that there is anything that needs fixing in the record. Well, the agency that issued the designation thinks there might be. But they didn't when they made those designations. They do now. But it's that earlier – Maybe they read your briefs and thought, gee, you know, maybe we ought to take another look at this. Well, I don't think they'd read our briefs. Not your briefs, petitioner's briefs. Not your briefs, petitioner's briefs. Well, respectfully, Your Honor, that decision isn't entitled to deference. It's the earlier – I wasn't suggesting any deference at all. Sure. I'm just asking you the practical problem of us ruling on a designation that the agency isn't defending in the absence of any prejudice. I mean, I don't – Your Honor, I think the point of prejudice is a large unknown here, that because they haven't told us what the process would entail on remand, nobody knows what it would entail. So it could amount to months, years of back and forth between the state and the agencies and commenting. To be sure – Well, there are procedures for dealing with that. The Clean Air Act has a provision for that. There's mandamus. Right? Well, we get those cases all the time here. But as we've seen over the past 20 minutes, none of that is certain. So – Nothing is certain. As the case currently stands, all of that can be avoided as to the Wisconsin designations, because Wisconsin has submitted substantial evidence supporting this narrow distance from the shoreline approach that EPA ultimately found persuasive. In its final technical support document, the agency's technical experts placed, quote, significant weight on Wisconsin's analysis. And I would point out that this wasn't just Wisconsin's studies, Wisconsin's models. These were the studies of a regional consortium. This is the lab coat that they talk about in the briefing. And this consortium agrees that this gradient exists, that the ozone levels are highest above Lake Michigan and that they dissipate quickly as we move away from the lake. And so between the lab coat studies – I understand all – I understand your argument. It's just – I can't get around the fact that you're – that the agency isn't making those arguments. The agency that issued the designation is not making that argument. And our preference would have been that they wouldn't? Yeah, sure, but they aren't. That's why I asked you my question. I think the point is, on this record, the court doesn't need the agency's arguments. The court has the agency's expertise. So you're saying – I mean, their judgment apparently is they don't want to defend them because they think maybe they're going to lose. And your judgment is we don't think so. We think we're going to win. If you were going to lose, you might be singing a different tune, right? You would rather not have us reach the merits and validate the designations and send everybody back to square one. I would trust. So it's really just a difference of assessment of where we are. I think the difficulty is – I mean, I really – I hear you and I hear Mr. Street that it can't be that an agency that has a deadline can blow through the deadline and do a kind of inadequate job, and then just all it gets from a court is more time to do a better job. And that, you know, when you have reliance of, like, we want to know what standard we have to meet, how and where we plan our development, how and where we deal with, you know, getting back into attainment, we want them to tell us in a timely manner. So I get that. And what we're struggling with as a court, though, is when it has done that, set it complete, something half-baked, and thinks it doesn't want to defend it and maybe shouldn't be defending it, how do we put the genie back in the bottle? How do we protect your reliance, interest, and interest in clarity and not let them get away with that if that's, you know, if that's an accurate description of what's going on? Frankly, Your Honor – Deadline. Would you support a deadline? What about that? That's an interesting question. Suppose we did this with a deadline. Would that satisfy you? It's better for you. It would be potentially better, but, you know, our concern is that the technically supported designation that our Department of Natural Resources has put together would be disregarded again. How do you know that? How do you know it would be disregarded? We don't. You don't know that. We don't know what the agency would do because what they discussed in their brief was basically the entire spectrum of what's possible. So we have no idea if they would give more explanation in support of these designations or if it would be a complete re-designation. We may think, LuDuan, that there are things they don't understand about some of these technical studies, and so one thing that could happen is they all go back and train them up a little better, or provide them with more of the underlying documentation, bolster that for ultimate review. That's certainly a possibility. The Wisconsin Department of Natural Resources' position is that there's already sufficient information in the record. Of course. And you may be right. You may be right. So if it were simply a remand for DNR and Wisconsin DNR and EPA to talk more, I guess we couldn't object to that, but the concern is that it wouldn't be so limited. Our DNR already presented a lot here, and so we think that the designations as they stand are supported by substantial evidence. As indicated specifically at JA 1299-1305 is EPA's primary analysis of the Wisconsin designations, and that's where they talk about the specific Wisconsin studies and analyses that they relied on. To be sure, they didn't rely on everything that we presented, but I think that that illustrates their exercise of expertise, that they noted that some of these things aren't enough, but some of them were, and that exercise of expertise is sufficient to support these designations. Thank you, Your Honors. Thank you. This Court commonly grants requests for voluntary remand from agencies without the agencies having to confess error or impropriety. But in all the cases I know of, the agency has told us much more than it's told us here. Like, you know, like in utility solid waste, they said that, you know, a development outside the agency's control is undermining the basis of the agency. A new statute authorized new regulatory options, new evidence. And we've got – in all these cases, there's much more than – all we've got basically here is let us supplement the record, right, and we will at least have a better record or we might lose the case. That's what we've been told, right? Yes. And respectfully, the Linnea case suggests that's all the agency needs to do is to profess an intention to take another look. And in Linnea, the problem there, and the reason the Court denied the voluntary remand request  there they wanted a remand so that persons could submit a new application for new consideration. But Linnea said essentially as long as EPA or an agency is looking to review their own action, that's enough. Do you think we have the ability to impose a deadline on EPA if we choose to accept your motion? Well, the remand that we're asking for here, Your Honor, is a remand of the action, not just of the record. And that's the distinction that this Court has described in Local Rule 41B. Right. So your answer is no. And the answer is no. So if we remand the record, then we could. That's right. But the agency is asking for a broader remand of the action so that it has the opportunity on remand to consider the record and potentially take a different approach if a different approach is warranted. But you understand the concern of your opponents. They're worried about delay. Can the agency give us any assurances of that? That's where their prejudice comes from. Is there anything you can tell us that alleviates our concern about delay? Just that the petitioners and the interveners have remedies available if EPA delays and that the agency is entitled to a presumption of regularity, which includes a presumption that it's going to act lawfully and in a timely manner. Do you have a sense, any sense of how long your client would take? I don't. And part of the reason is that it depends on how this Court decides and what it decides on the designations that are contested. Depending on what the Court says about the holistic analysis or even specific parts of the record for the other designations, that might affect the path that EPA takes on remand. Speaking just very quickly to the prejudice point, the prejudice that interveners point to are present any time an agency asks for voluntary remand. And this isn't anything exceptional here. The only case that any party cites in which a court has denied a voluntary remand request for prejudice is the Utility Solid Waste Activities Group case. And the prejudice there was materially different because there, the Court said that allowing voluntary remand would necessarily implicate another affirmative claim being brought by an intervener. And here, there's no such situation. Okay. Thank you. Thank you. David Bock for El Paso Petitioners. I'd like to just briefly say that in the Solid Waste Activities Group, the Court did say that an agency's motion to remand will generally be granted as long as there's some basis for reviewing the original action. And we provided ample basis for showing that the El Paso designation is on the law as it currently stands. So whether this Court were to remand EPA, to vacate and remand, or to reach the merits, we believe that the outcome is going to be the same. And the El Paso designation is manifestly unlawful, and it cannot be allowed to remain in place. One final point about the Solid Waste case. In that case, the Court declined the voluntary remand request, partly because it went to a question of law that would be intertwined with any exercise of discretion going forward. That's not the case here.  Thank you. Thank you. And once again for Petitioner Lynn Johnson. In the Linnea case, delay and remand led to a bit of chaos, and the appellate court needed to tell the district court, in effect, what to do. So in that sense, I think Linnea is useful to consider in the sense of what might happen here. I agree that the agency hasn't told us what it will do, but these challenge designations, these attainment area boundaries are so infected with serious deficiencies that remand is simply not supported. The agency goes so far as to move mountains in certain cases and disregards contribution from nearby areas of ozone precursors entirely in some of its, particularly in the Wisconsin line drawing exercise where only the ozone-rich area is included in the non-attainment area, not the nearby contributing area. I would note that the lab hill modeling, which Mr. Johnson described, shows that ozone levels are highest near the lake, yes, but it also shows precursor emissions coming from off land, and it underestimates the extent of non-attainment areas, according to EPA's record. EPA's technical support documents and – response to comments document does a good job of refuting the argument that the agency supported the technical basis of the Wisconsin model. And finally, on the utility solid waste activities group case, that decision also includes a vacatur of a rule based on unsupported reasoning and where the harms were to public health for leaving that unsupported rule in place. And this is such a case here. Thank you. You're way over time. Thank you. Thank you, sir. Was there another petitioner or are we good? Oh, sorry. Yeah, go ahead. Thank you, Your Honor. Certainly in the general case, it would save judicial resources to have a voluntary remand. There's no guarantee or really any reason to believe that would be the case here because we don't have any idea what EPA is going to do on remand. And when this court rightly has skepticism about what EPA is going to do or EPA's motivations and delay, I think the B.J. Allen case is a case where this court denied a voluntary remand, B.J. Allen, 1990, from this court. Certainly, as Judge Shadle pointed out, under this court's existing case law, it's not sufficient to simply say we want to – that in our cases, EPA has told us more than they told us here. It's not the same as saying what they told us here is insufficient. Let me put it another way then, which is to grant a voluntary remand on this case would be extending the case law and extending the justifications that were allowed, and I believe would set a bad precedent and an incentive for the EPA to do that in the future. Finally, we heard no answer to the fact that there's a specific statutory procedure that allows EPA to revisit existing designations, and that would address the deadline problem here. If this court denies the petition for review, EPA can go right back and do the proper statutory homework and due diligence that it needs to do and issue the notice and give reasons to the governor and then go through the process of getting better data or revising its designation. If there are no further questions, we'd ask that the petition be denied. Thank you, Your Honors. I'd like to just reply briefly to Ms. Weeks' point that the designations in Wisconsin are infected with deficiencies. As Judge Hillard questioned earlier, if the court were to find EPA's reasoning persuasive as to Sheboygan, which we urge the court to do, that reasoning applies throughout Wisconsin's lakeshore. So if Sheboygan is not infected with deficiencies, none of these other counties are infected with any deficiencies, and that's the position that our Department of Natural Resources urged in its second technical support document when EPA first promulgated only certain partial designations. Our DNR came back and said, no, no, this applies throughout our lakeshore. And so as Sheboygan, I think, is clearly sustainable, so are all the counties in Wisconsin. Thank you. Thank you. Now I think we're done. Thank you all for sticking pretty close to your times and for your helpful arguments. The case is submitted.
judges: Tatel, Griffith, Pillard